IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAWN OMAR JACOBS,            :
                                         :
                    Petitioner,     :         CIVIL ACTION NO. 17-569
                                           :
    v.                                 :
                                         :
SUPERINTENDENT DELBALSO, THE    :
DISTRICT ATTORNEY OF                :
MOTGOMERY COUNTY, and THE      :
ATTORNEY GENERAL OF THE STATE   :
OF PENNSYLVANIA,                :
                                         :
                  Respondents.    :

## **MEMORANDUM OPINION**

Smith, J.                                                          September 24, 2020

The *pro se* petitioner and a co-defendant were tried before a jury on various charges, including criminal homicide, in 2009. The jury convicted the *pro se* petitioner of first-degree murder and other offenses, and the trial court sentenced him to, *inter alia*, life imprisonment. After unsuccessfully raising a number of issues on direct appeal and then in a subsequent petition for post-conviction collateral relief, he has now filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Among his various claims, the petitioner asserts that the state prosecutor violated his rights under the Sixth Amendment's Confrontation Clause when the prosecutor referenced his name during closing argument at a point where the prosecutor was discussing the co-defendant's statement to the police.

This court referred the petition to the United States Magistrate Judge, who has authored a well-reasoned report in which she recommends denying the habeas petition. The petitioner filed timely objections to this report and recommendation, which are ripe for consideration.

As discussed below, the court will, in large part, overrule the objections and adopt the report and recommendation insofar as it recommends that the court deny the petition; however, the court will modify and supplement the report and recommendation because the court agrees with the petitioner that additional analysis is needed when it comes to the harmlessness of a clear confrontation clause violation.

## I.    BACKGROUND & PROCEDURAL HISTORY[1]

A jury sitting in the Court of Common Pleas of Montgomery County convicted the *pro se* petitioner, Shawn Omar Jacobs ("Jacobs"), of one count of first-degree murder, two counts of robbery, one count of criminal conspiracy to commit robbery, and one count of persons not to possess firearms on August 21, 2009.[2] The trial court sentenced Jacobs to life imprisonment, to be followed by a consecutive period of a minimum of 15 years to a maximum of 30 years' imprisonment. Super. Ct. PCRA Op. at ECF p. 3. Jacobs appealed from his judgment of sentence and fully exhausted his direct appeal rights when the United States Supreme Court denied his petition for a writ of certiorari on February 21, 2012. *Jacobs v. Pennsylvania*, 565 U.S. 1216

---

[1] As the Montgomery County Clerk of Court provided the court with an electronic copy of the record in Jacobs' underlying criminal case, the court will reference those documents where applicable here.

[2] Jacobs was tried along with a co-defendant, Stanley Howard ("Howard"). *See* Mem. Op. at ECF p. 1, *Commonwealth v. Jacobs*, No. 2755 EDA 2014 (Pa. Super. Jan. 4, 2017), Doc. No. 6-14 ("Super. Ct. PCRA Op."). Contrary to the state trial court's May 19, 2010 opinion and Magistrate Judge Heffley's report and recommendation, the jury convicted Howard of second-degree murder, not first-degree murder. *Compare* Op. at 1, n.5, *Commonwealth v. Jacobs*, No. CP-46-CR-2057-2009 (Montgomery Cnty. Ct. Com. Pl.), Doc. No. 6-42 ("Tr. Ct. Op.") (stating that "HowardJacobs [sic] was convicted of first degree murder, two counts of robbery, conspiracy to commit robbery, and person[s] not to possess firearms"); R. & R. at 2, Doc. No. 39 ("[Jacobs'] co-defendant, Stanley Howard . . ., was convicted of the same offenses[ as Jacobs.]"); *with* Super. Ct. PCRA Op. at 1 (explaining that jury convicted "[Jacobs] of first-degree murder and Howard of second-degree murder" and "both men of robbery and related offenses"); Docket, *Commonwealth v. Howard*, No. CP-46-CR-2058-2009 (Montgomery Cnty. Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/DocketSheets/CPReport.ashx?docketNumber=CP-46-CR-0002058-2009&dnh=tbpgbxO0RyZlrHO7UgrLUA%3d%3d (showing jury convicted Howard of second-degree murder). In addition, the report and recommendation indicates that the jury convicted Howard and Jacobs on August 17, 2009, when in fact the jury reached its verdict on August 21, 2009. *Compare* R. & R. at 1 (stating that "[o]n August 17, 2009, Jacobs was convicted after a jury trial"), *with* Tr. Ct. Op. at 7 ("The jury returned its verdict on August 21, 2009.").

(2012); Docket, *Commonwealth v. Jacobs*, No. CP-46-CR-2057-2009 (Montgomery Cnty. Ct. Com Pl.) ("Docket") at ECF pp. 17–18, Doc. No. 6.

Jacobs filed a *pro se* petition for post-conviction collateral relief under Pennsylvania's Post Conviction Relief Act ("PCRA") on July 19, 2012, and, after the PCRA court appointed counsel to represent Jacobs, counsel filed an amended PCRA petition on June 21, 2013. *See* Docket at ECF pp. 19, 21; Aug. 17, 2015 Op. ("PCRA Op.") at ECF p. 8, *Commonwealth v. Jacobs*, No. CP-46-CR-2057-2009 (Montgomery Cnty. Ct. Com Pl.), Doc. No. 6-81. Jacobs eventually filed a second amended PCRA petition and the PCRA court, after evidentiary hearings on January 23, 2014 and August 7, 2014, denied the second amended petition on August 25, 2014. *See* Docket at ECF pp. 25, 27; PCRA Op. at ECF pp. 8–9. Although Jacobs appealed from the denial of his second amended PCRA petition, the Superior Court of Pennsylvania declined to disturb the PCRA court's denial order. *See* Docket at ECF pp. 28, 31; Super. Ct. PCRA Op. at ECF p. 20. It does not appear that Jacobs filed a petition for allowance of appeal with the Supreme Court of Pennsylvania.

Jacobs then commenced the instant action by filing a petition for a writ of habeas corpus under 28 U.S.C. § 2254 on January 31, 2017.[3] Doc. No. 1. The court referred this matter to the Honorable Marilyn Heffley, United States Magistrate Judge, for the preparation of a report and recommendation on April 6, 2017. Doc. No. 3. As indicated above, the Montgomery County Clerk of Court submitted the original record electronically on April 13, 2017.[4] Doc. No. 6.

By letter dated April 11, 2017, Jacobs requested that the court stay this case, pursuant to *Rhines v. Weber*, 544 U.S. 269, 275-77 (2005), to allow him to exhaust in the state courts a second

---

[3] The federal "prisoner mailbox rule" provides that a *pro se* prisoner's petition is deemed filed "at the time petitioner delivered it to the prison authorities for forwarding to the court clerk." *Houston v. Lack*, 487 U.S. 266, 275–76 (1988). Here, Jacobs declares that he gave the petition to prison authorities for mailing on January 31, 2017. *See* Pet. Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("Pet.") at ECF p. 16, Doc. No. 1. The court uses this date as the filing date.

[4] The Montgomery County Clerk of Court also submitted the transcripts of a hearing on a motion to suppress and the trial transcripts on March 19, 2020. Doc. Nos. 34–38.

PCRA petition that he had filed based on alleged new evidence. Doc. No. 7. Jacobs also filed a brief supporting his motion to stay and abey, arguing that a new witness had come forward who averred that he was familiar with Jacobs and that, although he could not identify the perpetrators of the murder for which the jury had convicted Jacobs, he was sure that Jacobs was not one of the perpetrators. *See* Pet'r's Br. Supporting a Mot. to Stay and Abey at 2–3, 7–9, and Ex. A, Doc. No. 12. After respondents indicated that they had no objection to the stay, they also filed a response in opposition to Jacobs' petition for writ of habeas corpus. *See* Doc. Nos. 13, 19. Jacobs then filed another brief supporting his motion to stay and abey. Doc. No. 23.

On October 17, 2017, Judge Heffley issued a report and recommendation recommending that the undersigned grant Jacobs' motion for a stay pending the resolution of his second PCRA petition in the Pennsylvania courts. Doc. No. 24. On November 7, 2017, the undersigned approved and adopted the report and recommendation and stayed the case pending final resolution of Jacobs' second PCRA petition in the Pennsylvania courts. Doc. No. 26.

Jacobs then filed a memorandum of law in support of his previously filed petition for writ of habeas corpus that the clerk of court docketed on December 14, 2018. Doc. No. 27. The court was not informed that Jacobs' second PCRA petition was resolved until receiving a letter dated June 1, 2019 from Jacobs.[5] Doc. No. 28. Jacobs also filed an additional motion to lift the stay and abeyance dated June 4, 2019. Doc. No. 29. The court granted Jacobs' request to lift the stay and denied the duplicative motion to lift the stay as moot. Doc. No. 30. The court also referred the

---

[5] It appears that the PCRA court dismissed Jacobs' second PCRA petition without a hearing on November 6, 2018. *See* Docket, *Commonwealth v. Jacobs*, No. CP-46-CR-2057-2009 (Montgomery Cnty. Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/DocketSheets/CPReport.ashx?docketNumber=CP-46-CR-0002057-2009&dnh=DPL4HcNHh1s%2bSd5nNXZHeQ%3d%3d. Although Jacobs appealed from that denial to the Superior Court of Pennsylvania, he withdrew and discontinued that appeal in April 2019. *See id.*; *see also* Docket, *Commonwealth v. Jacobs*, No. 3535 EDA 2018 (Pa. Super.), *available at:* https://ujsportal.pacourts.us/DocketSheets/AppellateCourtReport.ashx?docketNumber=3535+EDA+2018&dnh=HCI L4TzFaIz9MN3h%2fYakdA%3d%3d.

matter back to Judge Heffley for a report and recommendation on the merits of Jacobs' petition. *Id.* Two days later, Jacobs filed a supplemental memorandum of law in support of ground five of his previously filed habeas petition. Doc. No. 31. Judge Heffley considered this supplemental submission, and all other briefs submitted by the parties, in her report and recommendation, which she issued on March 30, 2020. Doc. No. 39.

Regarding the substance of the petitioner's allegations, Judge Heffley appropriately summarized Jacobs' claims as follows:

> 1. The prosecution violated *Bruton v. United States*, 391 U.S. 123 (1968) in closing argument by twice mentioning his name in discussing his co-defendant Howard's confession, which had been redacted to exclude Jacobs' name;
>
> 2. His trial counsel was ineffective in failing to seek a mistrial after the alleged *Bruton* violation;
>
> 3. His trial counsel was ineffective in failing to file a motion to suppress Willis'[s] testimony identifying him as the shooter when it was based on an unnecessarily suggestive identification procedure;
>
> 4. The cumulative effect of his counsel's errors deprived him of his rights to effective counsel and to due process;
>
> 5. His trial counsel was ineffective in not objecting to the admission of even the redacted version of Howard's confession; and
>
> 6. His trial counsel was ineffective in failing to request a jury instruction, pursuant to *Commonwealth v. Kloiber*, 106 A.2d 820 (Pa. 1954), regarding the potential unreliability of eyewitness testimony.

R. & R. at 7–8, Doc. No. 39. Judge Heffley concluded that, with respect to Jacobs' first, second, and fifth claims, the Pennsylvania courts' determination that the prosecution had not violated *Bruton* during the closing argument was contrary to United States Supreme Court precedent and that the prosecution violated Jacobs' rights under the Confrontation Clause. *Id.* at 20. Judge Heffley also concluded that the Pennsylvania Superior Court's determination that any *Bruton* violation was harmless was not inconsistent with, or an unreasonable application of, Supreme

Court precedent. *Id.* at 20–22. Judge Heffley further concluded that Jacobs' trial counsel was not ineffective for failing to move to suppress Willis's testimony or in failing to request a jury instruction based on *Commonwealth v. Kloiber* (for which Judge Heffley determined was also procedurally defaulted). *Id.* at 22–34.

While Judge Heffley addressed these claims in March, due to the clerk's office operating almost entirely remotely until close to the end of June because of the COVID-19 pandemic, the clerk's office did not mail the report and recommendations to Jacobs until August 10, 2020. *See* Unnumbered Docket Entry After Doc. No. 41. Although Jacobs had until August 27, 2020, to file objections to the report and recommendation, he filed a motion for an extension of time to file his objections on August 18, 2020, claiming that he never received a copy of the report and recommendation because the clerk's office incorrectly mailed it to his previous prison address. Doc. No. 42. On August 20, 2020, the court granted Jacobs' motion for an extension of time to file his objections, giving him until September 21, 2020 to file objections, and directed the clerk of court to serve a copy of Judge Heffley's report and recommendation upon him at his updated address. Doc. No. 43. Jacobs then timely filed his objections to the report and recommendation on September 1, 2020. *See* Doc. No. 44.

Jacobs raises the following objections: (1) Judge Heffley erred in concluding that the *Bruton* error presented in ground one is harmless by applying the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") deferential standard of review to a "finding of harmless error" by the state court regarding the *Bruton* error claim presented in ground two; (2) Judge Heffley erred in deferring to "a finding of harmless error" by the state court regarding the *Bruton*-based ineffectiveness claim presented in ground two, arguing that since the state courts rejected this claim without addressing harmlessness, it was plain error for the magistrate court to find the

error harmless by applying AEDPA's deferential standard rather than conducting a *de novo* harmless error review; (3) Judge Heffley erred in concluding that the Pennsylvania Superior Court's ruling that the *Bruton* violation was harmless was not inconsistent with, or an unreasonable application of Supreme Court precedent and that since the Superior Court never ruled that the *Bruton* violation was harmless, Judge Heffley plainly erred by interpreting the Superior Court's prejudice-prong analysis required by *Strickland v. Washington*, 466 U.S. 668 (1984) as a finding of harmless error regarding the *Bruton* violation and deferring to that finding; (4) Judge Heffley erred in concluding that because the *Bruton* errors presented in grounds one and two were harmless, it was unnecessary to separately address Jacobs' fifth claim, which asserted a separate *Bruton*-based error; (5) Judge Heffley erred in concluding that his trial counsel was not ineffective in failing to move to suppress Willis's testimony as the pre-trial identification procedure was unnecessarily suggestive; (6) Judge Heffley erred by concluding that his trial counsel was not ineffective in failing to request an instruction based on *Commonwealth v. Kloiber*; (7) Judge Heffley erred by determining that Jacobs' cumulative error claim is meritless; and (8) Judge Heffley should not have recommended that this court deny and dismiss his petition for writ of habeas corpus and should have determined that there was a substantial showing of the denial of a constitutional right requiring the issuance of a certificate of appealability. Objs. to R. & R. ("Objs.") at ECF pp. 4–26, Doc. No. 44. The respondents did not file a response in opposition to the objections; as such, the report and recommendation and the objections thereto are now ripe for disposition.[6]

---

[6] The court does not find that an evidentiary hearing is warranted in this matter.

## II.     DISCUSSION

### A.     Applicable Standard of Review

When a petitioner files timely objections to a report and recommendation by the magistrate judge, the court conducts a *de novo* review of the portions of the report to which the petitioner objects. *See* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *see also Robinson v. Hicks*, 450 F. App'x 168, 172 (3d Cir. 2011) ("The District Court must conduct a de novo review of the portions of the R & R to which objections are made."). Despite this *de novo* review, the court may "rely upon the magistrate judge's proposed recommendation to the extent that [the court], in the exercise of sound discretion, deem[s] proper." *Wallace v. Keen*, Civ. A. No. 3:12-CV-1366, 2012 WL 5197948, at *1 (M.D. Pa. Oct. 19, 2012) (citing *United States v. Raddatz,* 447 U.S. 667, 676 (1980) and *Goney v. Clark,* 749 F.2d 5, 7 (3d Cir. 1984)). This court may "accept, reject, or modify, in whole or in part," the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1). "The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.* Here, because Jacobs filed timely objections, the court will review the report and recommendation *de novo*.

### B.     Analysis

After conducting a *de novo* review of the portions of the report and recommendation to which Jacobs objects, the court concurs with Magistrate Judge Heffley's ultimate conclusion that this court should deny the habeas petition and not issue a certificate of appealability. Although the court agrees with Judge Heffley's ultimate conclusion to deny the petition, the court must sustain one of Jacobs' objections insofar as he complains that the court must conduct a *de novo* analysis with regard to the harmlessness of the *Bruton* error instead of deferring to the state courts'

determinations regarding the harmlessness of any error. The court addresses this issue and Jacobs'

other objections in turn.

### 1.     Jacobs' First Objection

Jacobs' first objection is that Judge Heffley erred by finding the *Bruton* error in ground one

harmless.[7] Objs. at ECF p. 4. Judge Heffley described the evolution of the *Bruton* issue during

Howard and Jacobs' trial as follows:[8]

> Howard gave a statement to the police in which he confessed to his participation in
> the robbery of Terry and Willis and implicated Jacobs as the person with whom he
> committed the robbery and the person who shot Terry. Tr. Ct. Op. at 17-18 & n.12.
> Howard's statement was introduced at trial as direct evidence. *Id.* at 17-18. The
> statement was redacted to replace all references to Jacobs with the words "the other
> person." *Id.*; *see* Super. Ct. PCRA Op. at 10-12. During closing argument, however,
> the prosecution twice stated Jacobs' name in discussing Howard's confession rather
> than referring to him as "the other person." Super. Ct. PCRA Op. at 10-12. First,
> after discussing Willis' testimony and arguing that it was a sufficient basis to
> convict Jacobs of Terry's murder, the prosecution discussed other corroborating
> evidence that the Commonwealth had presented, including Howard's confession,
> which it maintained corroborated Willis' testimony regarding the roles of Jacobs
> and Howard in the crime, arguing as follows:
>
> > Furthermore, [Howard], in his statement to Detective
> > McGowan, you remember the progression of truth, but when we
> > ultimately got to the point where [Howard] told Detective
> > McGowan the full truth, what did [Howard] say? What did he
> > attribute that his role in the robbery was?
> >
> > He said that I was with this other person, and that I knew it
> > was going to happen, and we were dressed in all black, and we were
> > in the Golden Dragon, and we saw these two guys leave, and we
> > followed them, and I knew what was going to happen when the other
> > person said, "we out," I knew it was going to happen, and we each
> > took control of one of the different guys, but I didn't have control of
> > the guy who died, I didn't shoot the guy who dies, I had control of
> > the guy with the ponytail.

---

[7] By way of brief background, "the evidence presented at trial established that [Jacobs and Howard] conspired to rob
Jamal Terry [("Terry" or "Mr. Terry")] and Andrew Willis [("Willis" or "Mr. Willis")] in Norristown, Montgomery
County, Pennsylvania. While perpetrating the resulting robbery—in which Howard actively participated—[Jacobs]
shot and killed Mr. Terry, employing a gun given to him by Howard." R. & R. at 2 (quoting Tr. Ct. Op.).

[8] Jacobs has not objected to Judge Heffley's description of what occurred in the state trial court on this issue and this
court does not find any error in her description.

> You look at [Willis]. Willis has a ponytail, and the only thing [Howard] reverses is he says he doesn't pistol whip [Willis]. [Howard] tries to take that off of himself, but he clearly implicates himself in the entire robbery, and in his own statement, he attributes his actions as being identical to the one[s] that [Willis] has said, save the pistol whipping. [Howard] says he is in control of [Willis]. He said that Jacobs has control of [Terry]. So not only is [Willis's] testimony corroborated by the physical evidence at the scene, but it is also corroborated by [Howard's] statement given to Detective McGowan, less than a week after this crime occurred.

*Id.* at 10-11 (emphasis omitted). Trial counsel did not object to this first reference to [Jacobs'] name when the prosecution was discussing Howard's redacted statement. *Id.* at 11.

Later in the closing argument, the prosecution again stated Jacobs' name in arguing that Howard's confession corroborated Willis' testimony regarding Jacobs' participation in the crime:

> THE PROSECUTOR: [I]t's reasonable to conclude that both of these individual's [sic] had contact with that gun, given that it was in close proximity to their position when they were found by the police, and, again [Howard] testified that at the very least, both of them were holding it in the car.
>
> But if you also recall, [Howard] said in his statement that they were both holding it in the car, but you also recall that [Howard] said in his statement that [Jacobs] had handled the gun on the night-
>
> TRIAL COUNSEL: Objected to, Your Honor.
>
> THE PROSECUTOR: Pardon me. That the other person had handled the gun on the night of the murder, and [Howard] had briefly handled that gun on the night of the murder.

*Id.* at 11-12 (emphasis and record citations omitted).

As Judge Heffley further explained:

> Jacobs challenged the second of the two mentions of his name on direct appeal, arguing that the trial court failed to actually rule on his counsel's stated objection and that the mention of his name violated *Bruton*. *See* Tr. Ct. Op. at 17-20. The trial court rejected Jacobs' claim that it had erred in failing to explicitly rule on his counsel's objection. *Id.* at 18-19. It reasoned that the prosecutor had immediately corrected himself after defense counsel's objection and that for the

court to rule on the objection after the prosecutor had corrected himself, "would have needlessly called attention to [the prosecutor's] comment." *Id.* at 19. It also concluded that the mention of his name in a discussion of Howard's confession did not prejudice Jacobs because, as the trial court explained:

> Given the fleeting and isolated nature of the prosecutor's misstep, given that the prosecutor immediately corrected himself, given that the statements by Stanley Howard were properly redacted and that no arguable violation of *Bruton*, *supra*, occurred within the evidentiary stage of the trial, and given the court's strong instruction to the jury both to the effect that the arguments of counsel did *not* constitute evidence (N.T., August 21, 2009, p. 85) *and* as to the limited purpose for which the jury could consider Stanley Howard's statement (N.T., August 21, 2009, p. 107), we believe that defendant simply is not entitled to relief on his claim.

*Id.* at 20 (emphasis in original).

On PCRA review, Jacobs challenged both of the two mentions of his name set out above during closing argument. *See* PCRA Ct. Op. at 22-23. The PCRA court rejected Jacobs' argument, reasoning regarding the first of the two mentions of his name that:

> [I]t is plain on the face of the record that [the prosecutor] was addressing defendant *Howard's* role in the crime, and was discussing the manner in which Howard's statement served to corroborate the testimony of [Willis] that implicated *Howard*. In any event, to the extent that the [prosecutor's] fleeting reference to [Jacobs] by name in this comment could be said to have in any way worked arguable prejudice against [Jacobs], any such prejudice was cured by the undersigned's clear instruction that Howard's statement could *only* be considered as evidence against defendant *Howard*, and *not* as evidence as to [Appellant].

*Id.* at 23-24 (emphasis in original).

As to the legal merits of Jacobs' *Bruton* claim, the PCRA court relied on the Pennsylvania Supreme Court's decision in *Commonwealth v. Brown*, 925 A.2d 147 (Pa. 2007) [hereinafter "*Brown-I*"], in holding that "a prosecutor's reference to a defendant by name in his closing—when discussing a non-testifying co-defendant's statement that had been redacted to eliminate reference to the defendant by name—does *not* implicate the *per se* rule of Bruton [sic] . . . ." PCRA Ct. Op. at 22 (emphasis in original). It again held that, because it gave the jury limiting instructions regarding the use of Howard's confession, any prejudice from the prosecutor's mentions of his name had been cured. *Id.* at 23-24.

On PCRA review, the Superior Court agreed with the trial court's reasoning. *See* Super Ct. PCRA Op. at 12-15. It, too, pointed to the Pennsylvania Supreme Court's decision in *Brown-I* as well as to other Pennsylvania decisions holding that the per se rule of *Bruton* does not apply to statements made by prosecutors in closing argument and that such statements, "which are by definition nonevidentiary," can be cured by an effective limiting instruction. *Id.* at 15. It also found no error in the PCRA court's reasoning that any prejudice arising from the prosecutor's remarks "did not require a mistrial and could be cured by the [trial] court's *Bruton* instruction." *Id.* (emphasis omitted). Furthermore, it concluded that "the evidence against [Jacobs] was overwhelming and there is no reasonable basis to conclude that outcome [sic] at trial would have been different had trial counsel objected or requested a mistrial." *Id.*

*Id.* at 13–15 (internal footnote omitted).

Here, Jacobs argues that "[s]ince the state courts rejected the *Bruton* error claims presented in ground one without addressing harmlessness, it was plain error for the magistrate judge to find the error harmless applying AEDPA's deference rather than conducting its own harmless error review de novo." Objs. at ECF p. 4. He bases this argument on the assumption that "[s]ince the harmfulness of the *Bruton* error in ground one was not 'adjudicated on the merits' it was not entitled to AEDPA's deference and hence, [Judge Heffley] was required to conduct [her] own harmless error review de novo." *Id.* at ECF p. 6. He further argues that "to the extent that the state court's legal conclusion that the limiting *Bruton* instruction cured any prejudice is a 'finding of harmless error,' that finding was not entitled to AEDPA's deference either where it is contrary to Supreme Court precedent." *Id.* After reviewing the harmless error analysis performed by Judge Heffley, the court sustains Jacobs' first objection because Judge Heffley should have conducted a *de novo* review of the evidence.

Judge Heffley correctly notes that the PCRA court did not discuss harmless error in relation to *Bruton*, but it did discuss it regarding Jacobs' claim about the admissibility of Mr. Willis's

eyewitness testimony.[9] R. & R. at 21. She then accurately points out that the Superior Court did, in a single line of the opinion affirming the PCRA court's denial of relief on Jacobs' *Bruton* claim, conclude that the evidence of guilt against Jacobs was overwhelming and (as required under *Strickland*)[10] there was no reasonable basis to conclude that the outcome of the trial would have been different if Jacobs' counsel objected or requested a mistrial. *Id.* Judge Heffley next indicates that a harmless error determination is one on the merits and therefore subject to AEDPA deference. *Id.* (quoting *Johnson v. Lamas*, 850 F.3d 119, 133–34 (3d Cir. 2017)). While Jacobs argues that the purported harmless error analysis in this case is not subject to deference, "where a state court has concluded that the error was harmless on direct review, . . . we must defer to that determination under AEDPA unless the state court unreasonably applied *Chapman v. California*[, 386 U.S. 18 (1968)]." *Johnson*, 850 F.3d at 133 (citing *Davis v. Ayala*, 576 U.S. 257, 268–69 (2015)). Thus, based on *Johnson*, Judge Heffley correctly noted that "[a] finding of harmless error 'constitutes an adjudication on the merits' and it is, therefore, subject to AEDPA deference." R. & R. at 21 (quoting *Johnson,* 850 F.3d at 133–34). However, the court notes that Jacobs is correct that in this case deference to the state courts' analysis regarding harmlessness is improper, as the state courts did not conduct a harmless error analysis given that they failed to find an underlying *Bruton* violation.[11]

---

[9] On appeal from the denial of his PCRA petition, Jacobs argued that the PCRA court should have found his counsel ineffective for failing to confront and impeach Mr. Willis's testimony because he purportedly "gave a prior statement to police that he did not see the faces of the perpetrators of the robbery and killing of" Mr. Terry. Oct. 15, 2014 Concise Statement of Matters Complained of on Appeal at 1–2, Doc. No. 6-102; *see* also Super. Ct. PCRA Op. at 14–20.

[10] As also discussed later in this opinion, under *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

[11] While it is true that the state courts never specifically determined that any *Bruton* error was harmless and, therefore, this court should not defer to their determinations, the state courts did address whether any prejudice existed per *Strickland*. Jacobs raises an issue with the conflation of the harmless error standard and the *Strickland* prejudice standard in his third objection. *See* Objs. at ECF p. 11 ("Since the Superior Court never ruled that the *Bruton* violations was [sic] harmless, the magistrate judge plainly erred by interpreting the Superior Court's prejudice-prong analysis required by *Strickland* as a 'finding of harmless error' regarding the *Bruton* violation and deferring to that finding in this regard."). The Third Circuit has noted "*Strickland* prejudice and *Brecht* [*v. Abrahamson*, 507 U.S. 619, 638

Nonetheless, even though this court sustains Jacobs' objection that Judge Heffley erred in utilizing a deferential standard of review to the state courts' determination on harmless error (either because the state courts never reached a decision on harmless error or because the standard of review for harmless error and *Strickland* prejudice are not the same), the court finds that Jacobs is still not entitled to relief. This is because the court finds that the error is harmless under *de novo* review.

As previously noted, Judge Heffley correctly concluded that the Pennsylvania courts unreasonably applied clearly established federal law when deciding that there was no *Bruton* violation.[12] Notwithstanding this determination, the court must still determine whether the *Bruton* error can be considered harmless. *See Rainey v. Sec'y Pa. Dep't of Corr.*, 658 F. App'x 142, 152 (3d Cir. 2016) ("Notwithstanding our determination that the use of Williams's statement here violated Rainey's right to confront the witnesses against him, . . . we must still determine whether those errors can be considered harmless."). To be entitled to habeas relief, Jacobs must establish that the trial error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

___

(1993)] harmless error are essentially the same standard[.]" *Breakiron v. Horn*, 642 F.3d 126, 147 n.18 (3d Cir. 2011) (alteration in original) (citation and internal quotation marks omitted). There are also a number of district court cases that rely on this determination. *See, e.g.*, *Howard v. Horn*, 56 F. Supp. 3d 709, 732 (E.D. Pa. 2014) ("Thus, for a federal court on habeas review, the harmless inquiry under *Brecht* is coextensive with *Strickland's* prejudice inquiry."). In contrast, a number of courts have explained that harmless error review is less burdensome than *Strickland's* prejudice inquiry. *See, e.g.*, *Willingham v. Bauman*, No. 20-1017, 2020 WL 3791943, at *5 (6th Cir. Apr. 22, 2020) ("[B]ecause the standard for demonstrating harmless error is less stringent than that for establishing *Strickland* prejudice, *see Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995); *Hall v. Vasbinder*, 563 F.3d 22, 236 (6th Cir. 2009), [the appellant] necessarily cannot make a substantial showing of *Strickland* prejudice. This claim does not deserve encouragement to proceed further."); *United States v. Cassell*, 530 F.3d 1009, 1018 (D.C. Cir. 2008) (explaining that "harmless error standard of review" is "more favorable to defendant than prejudice prong of *Strickland*"); *Howard v. Gittere*, 392 F. Supp. 3d 1205, 1214 (D. Nev. 2019) ("[T]he prejudice standard under *Strickland* is more difficult than the *Brecht* harmless error standard." (citations omitted)).

     This court need not address whether the two standards are distinguishable because even if the court agrees with Jacobs that the two standards are different, the result is that the court should not defer to the state courts regarding whether the *Bruton* violation was harmless and, as such, should conduct a *de novo* harmless error review. The court has already determined that a *de novo* harmless error review is required in this case.

[12] The respondents did not object to Judge Heffley's determination of an underlying *Bruton* violation.

14

The court must have "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Davis*, 576 U.S. at 267–68 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). In performing the proper *de novo* harmless error analysis, the court relies on several factors to guide its review such as "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Johnson*, 850 F.3d at 133 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). The court addresses these factors in turn.

First, with respect to the witness' testimony in the prosecution's case, the court finds this factor weighs against Jacobs as Howard's testimony was not essential to the government's case. Even absent Howard's statements, there was still tremendous evidence of Jacobs' guilt.

As the PCRA court explained, the evidence against Jacobs

includ[ed], *inter alia*: the discovery of [Jacobs'] DNA on the murder weapon; Officer Saxon's observation of [Jacobs] in the vicinity of the Golden Dragon [the location where one of the victims, Mr. Willis, noticed two men standing by the door, just hanging around immediately before the robbery] on the day of the murder; [Jacobs'] flight from Officer Saxon several days after the murder; and the discovery of the murder weapon outside the Chevy Lumina where [Jacobs] had been sitting.

*Commonwealth v. Jacobs*, No. CP-46-CR-2057-2009 (Montgomery Cnty. Ct. Com. Pl. Aug. 14, 2015) ("PCRA Ct. Op.") at ECF p. 20, Doc. No. 6-81. The PCRA court found that "the evidence presented of defendant's guilt was overwhelming."[13] *Id.* Although the court acknowledges that

---

[13] In addition to this evidence, Mr. Willis unequivocally and positively identified Jacobs during a physical line-up on July 8, 2009 and in open court during the trial. The court recognizes that Jacobs raises issues with Mr. Willis's in-person identification of him because he failed to positively identify a photograph of Jacobs from a photo array shown to him shortly after the crimes occurred, but even then, Mr. Willis was "pretty sure" that Jacobs was one of the perpetrators, but could not be certain of his identification due to the lighting of the photograph.

Howard's statement was somewhat important to the prosecution's case against Howard, the court finds that it was not essential given the overwhelming amount of evidence against Jacobs.

With regard to the second factor, the court further finds that Howard's account was largely cumulative of the overwhelming evidence of guilt as discussed above, including, *inter alia*, the testimony of Mr. Willis at trial. *See Rainey*, 658 F. App'x at 152 ("Here, although Williams's statement was important to the prosecution's case, we nevertheless find the error harmless because the evidence of Rainey's guilt was so overwhelming and because Williams's statement was largely cumulative of the other evidence presented.").

With regard to the third factor, "the presence or absence of evidence corroborating or contradicting [Howard's statement] on material points," *Van Arsdall*, 475 U.S. at 684, the court finds that this factor also weighs against Jacobs. As already explained, Howard's account was corroborated by Mr. Willis' testimony regarding the roles of Jacobs and Howard in the crime, and at trial, Mr. Willis definitively identified the two men that he saw at Golden Dragon immediately prior to the murder as Jacobs and Howard, testifying that he was "one hundred percent sure" of the accuracy of his identification. Tr. Ct. Op. at 2 (quoting Notes of Testimony, Aug. 20, 2009 ("Aug. 20, 2009 N.T."), at pp. 42–44, 69).[14] Mr. Willis then went on to testify that upon leaving the Golden Dragon, he turned to observe defendant Jacobs and Howard approaching him and Mr. Terry. *Id.* (citing Aug. 20, 2009 N.T. at 45–48). He testified that Howard was armed with a black handgun, and that after Jacobs and Howard separated him and Mr. Terry, and after Howard pistol-whipped him multiple times while robbing him, Howard turned over the handgun to Jacobs. *Id.* at 2–4 (citing Aug. 20, 2009 N.T. at 45–52, 54–61). Mr. Willis then testified that he heard a gunshot coming from the area where Mr. Terry and Jacobs were standing. *Id.* at 4 (citing Aug. 20, 2009

---

[14] These portions of the trial transcript are also available at Doc. No. 37.

N.T. at 66–67). Such an account corroborates Howard's statement on the material points, although the court does note what it deems to be an immaterial contradiction, which is that Howard claims to never have pistol-whipped Mr. Willis. Super. Ct. PCRA Op. at 10 (quoting prosecutor's closing argument in which he indicates that Howard denied pistol whipping Mr. Willis in his statement to police).

Furthermore, Officer Saxon's testimony also corroborates Howard's account. As the trial court summarized:

> Officer Brian Saxon of the Norristown Police Department testified that he was among the officers responding to the murder scene on the night of December 10, 2008 (N.T., August 19, 2009, pp. 113-123). Officer Saxon further testified that he had been on patrol earlier that same day and that, at approximately 4:30 p.m., he had observed a white Chevrolet Lumina parked illegally in front of the Golden Dragon restaurant (N.T., August 19, 2009, pp. 108-109). Officer Saxon testified that, while he was writing parking tickets for the Lumina, an individual approached him and asked what he was doing with the car. Officer Saxon explained that he was writing tickets for illegal parking, and the individual responded: "That's all right, we'll just pay them." Officer Saxon secured the tickets (Exhibit C-12) on the windshield of the vehicle and left the scene. At trial, Officer Saxon identified the individual who had approached him, and who had spoken to him while he was writing the tickets, as defendant Jacobs (N.T., August 19, 2009, pp. 109-114).

> On the night of December 13, 2008—three days after the murder of Jamal Terry—Officer Saxon was again on patrol duty in Norristown, accompanied by Officer Smith of the Norristown Police Department (N.T., August 19, 2009, pp. 123-124). Officer Saxon testified that he and Officer Smith were keeping an eye on open businesses because of a recent rash of robberies (N.T., August 19, 2009, p. 124). At approximately eight p.m., the officers were proceeding on Chain Street when Officer Saxon once again saw the same white Chevy Lumina that he previously had seen parked illegally in front of the Golden Dragon on the day Mr. Terry was killed. As the officers drove by, Officer Saxon saw two people sitting in the front seat of the Lumina and informed Officer S[mith] that "that's the car I put the tickets on," (N.T., August 19, 2009, pp. 124-125).

> After being briefly called away to an incident in another part of Norristown, Officer Saxon suggested to Officer Smith that they return to Chain Street to see if the Lumina and its occupants were still at the location on Chain Street (N.T., August 19, 2009, p. 125).

When the officers arrived back on Chain Street, the Lumina was still there. The officers pulled up approximately ten feet behind the Lumina and Officer Smith turned a spotlight on the vehicle – which had a tinted rear window – to determine if anyone was inside. Officer Saxon testified that:

> "As soon as the spotlight went on, I saw the driver reach down toward the center floorboard, toward the passenger area, and immediately the passenger's door opened." (N.T., August 19, 2009, pp. 125-126).

The driver's door opened immediately after the passenger door, and Officers Saxon and Smith exited their vehicle with their guns drawn, with Officer Saxon approaching the Lumina on the passenger's side and Officer Smith approaching on the driver's side (N.T., August 19, 2009, pp. 126-127).

Officer Saxon testified that there were two individuals inside the Lumina: Stanley Howard and defendant Jacobs, with Howard in the driver's seat and Jacobs in the passenger's seat (N.T., August 19, 2009, p. 127).

Defendant Jacobs exited the Lumina as the officers approached. Officer Smith took control of Howard and Officer Saxon attempted to take control of Jacobs. Seeing that defendant Jacobs was not carrying a weapon, Officer Saxon holstered his own gun. Defendant, however, "spun away" from him and ran off. Officer Saxon gave chase, but was unsuccessful in catching up to defendant (N.T., August 19, 2009, pp. 127-129).

While attempting unsuccessfully to locate defendant, Officer Saxon received a radio call from Officer Smith, informing him that a gun had been found beside the Lumina. Officer Saxon returned to Chain Street and saw a black Kel-Tec .9 millimeter handgun lying in the gutter next to the Lumina's passenger door where defendant Jacobs had exited the vehicle (N.T., August 19, 2009, pp. 129-130). Officer Saxon testified that he also saw, in plain view on the passenger seat of the Lumina, a "MAC" card bearing the name "Shawn Jacobs" (N.T., August 19, 2009, p. 150).

Tr. Ct. Op. at 4–6. The accounts of Mr. Willis and Officer Saxon were further substantiated by the investigatory evidence, such as the firearm evidence, in which Detective Finor testified that, in his expert opinion, the bullet recovered from Mr. Terry's body and the shell casing recovered at the murder scene had been fired from the Kel-Tec handgun, which had been recovered from the gutter next to the passenger door of the Lumina. *Id.* at 7 (citing Notes of Testimony, August 19, 2009, at pp. 206–09). Katherine Cross, a forensic biologist, additionally testified that Jacobs' DNA was

18

recovered from the same gun. *See* Aug. 20, 2009 N.T. at 32. The court finds that the existence of all this evidence corroborating Howard's statement on material points weighs in favor of a finding of harmless error.

However, the fourth factor, the extent of cross-examination otherwise permitted, weighs in favor of Jacobs. Howard gave a statement to the police in which he confessed to his participation in the robbery of Mr. Terry and Mr. Willis and implicated Jacobs as the person with whom he committed the robbery and the person who shot Mr. Terry. Tr. Ct. Op. at 17–18 & n.12. This statement was introduced at trial as direct evidence against Howard, with all references to Jacobs being replaced with the words "the other person." *Id.* As Judge Heffley correctly found, when the prosecution twice stated Jacobs' name in discussing Howard's confession during closing argument rather than referring to him as "the other person," the prosecution violated *Bruton*'s mandate and, as such, violated the Confrontation Clause. The inability of Jacobs' counsel to cross-examine Howard about his statement deprived Jacobs of the chance to demonstrate potential bias on the part of Howard and the opportunity to elicit any contradictions between the statement and the potential cross-examination testimony of Howard. The fourth factor therefore weighs in favor of Jacobs. *See David v. Eckard*, Civ. A. No. 14-7123, 2017 WL 3388921, at *15 (E.D. Pa. Aug. 7, 2017) ("The inability to cross-examine Jones about the statement deprived Petitioner of the opportunity to demonstrate to the jury Jones's potential bias, that is, that Jones made the statement to curry favor with law enforcement in return for leniency in sentencing. . . . Such cross-examination may well have influenced the jury's assessment of Jones's credibility in making the statement to Detective Cahill. In addition, it deprived Petitioner of the opportunity to elicit any contradictions or discrepancies between the statement and potential cross-examination testimony Jones may have given.").

As for the final factor, the overall strength of the prosecution's case, it weighs against Jacobs, as the case against him was overwhelming for the reasons noted above. The finding of Jacob's DNA on the gun, as well as the accounts of Mr. Willis and Officer Saxon, are particularly persuasive. Therefore, after considering all the harmless error factors, because the court finds that Howard's statement did not add anything new to the overwhelming evidence of Jacobs' guilt, the *Bruton* violation did not have a "substantial and injurious" effect on the jury's verdict. *See Rainey*, 658 F. App'x at 153 ("Because Williams's statement added next to nothing new to the overwhelming evidence of Rainey's guilt, we find that the *Bruton* violation did not have 'substantial and injurious' effect on the jury's verdict . . . ."). Despite the fact that the court sustains Jacobs' first objection, after conducting the above analysis, the court must still find the *Bruton* error harmless.

### 2.        Jacobs' Second Objection

Jacobs' second objection is similar to his first objection, except in this objection he argues that he "specifically objects to the magistrate court's legal conclusion that it must defer to 'a finding of harmless error' by the state court regarding the *Bruton* based ineffectiveness claim presented in ground two." Objs. at ECF p. 7. He again argues that

> [s]ince the state courts rejected the *Bruton* based ineffectiveness claim presented in ground two [Jacobs' argument that trial counsel was ineffective in failing to object to the first mention of Jacobs' name and in failing to request a mistrial when he objected to the second mention of Jacobs' name] without addressing harmlessness, it was plain error for the magistrate court to find the error harmless applying AEDPA's deferential standard rather than conducting its own harmless error review de novo.

*Id*.

Regardless of whether Judge Heffley is correct in giving deference to the state courts' opinions with regard to ground two, as it seems the Superior Court determined that there was no

prejudice from any possible ineffective assistance of counsel, the court reiterates the finding that the *Bruton* error was harmless. To satisfy the prejudice prong of the *Strickland* analysis, a petitioner must demonstrate that counsel's errors were "so serious as to deprive [petitioner] of a fair trial, a trial whose result is reliable." 466 U.S. at 687. A petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. Given that the court has already determined that there is not a reasonable probability that the result of the trial would have been different even if counsel properly objected, as the *Bruton* violation was ultimately harmless, the court finds that this objection does not warrant granting Jacobs' petition.

### 3.      Jacobs' Third Objection

The court next addresses Jacobs' third objection, that "the Pennsylvania Superior Court's ruling that the *Bruton* violation was harmless was not inconsistent with, or an unreasonable application of Supreme Court precedent." Objs. at ECF p. 11. The court is unsure what Jacobs is arguing by this statement, as both Judge Heffley and this court agree that a finding of harmless error in this case is not an unreasonable application of Supreme Court precedent. Nevertheless, in this third objection, Jacobs goes on to argue that "[s]ince the [S]uperior [C]ourt never ruled that the *Bruton* violations was [sic] harmless, the Magistrate Judge plainly erred by interpreting the [S]uperior [C]ourt's prejudice-prong analysis required by *Strickland* as a 'finding of harmless error' regarding the *Bruton* violation and deferring to that finding in this regard." *Id.* While the court agrees that it is unclear that a finding of prejudice under *Strickland* is the same as a finding of harmless error, for the reasons discussed above the court sustains the objection only insofar as Judge Heffley should have conducted a harmless error review of the *Bruton* violation. Nonetheless, because this court just undertook a *de novo* harmless error analysis and found that any error that

21

took place was indeed harmless, this objection does not change the outcome of the report and recommendation.

Jacobs further argues that "to the extent that the Superior Court's legal conclusion that 'the evidence against [Jacobs] was overwhelming…' is a harmless determination as to the *Bruton* violations, Jacobs maintains that this determination is an unreasonable application of Supreme Court precedent." *Id.* at ECF p. 12. However, Jacobs does not explain why this would be an unreasonable application of Supreme Court precedent, and the court finds no reason to believe that a finding of overwhelming evidence of Jacobs' guilt in this case would go against any applicable precedent. Jacobs also incorrectly argues that the "trial courts failure to give cautionary instructions or take any other remedial measures sufficient to prevent the prosecutor's comments from substantially affecting the juror's deliberative processes" is an error to be considered. *Id.* at ECF p. 13. However, the trial court did indeed give cautionary instructions that "Howard's statement could *only* be considered as evidence against defendant *Howard*, and not as evidence as [to] defendant *Jacobs*." PCRA Ct. Op. at 23–24 (emphasis in the original). Therefore, the court must overrule this part of the objection.

### 4.        Jacobs' Fourth Objection

With his fourth objection, Jacobs objects to the finding that "because [Judge Heffley] found the *Bruton* errors presented in grounds one and two harmless, 'it is not necessary to separately address Jacobs' fifth claims,' which asserted a separate *Bruton* based error." Objs. at ECF p. 15. The court, however, overrules this objection as Jacobs' fifth claim, which pertains to Jacobs' trial counsel being ineffective in not objecting to the admission of even the redacted version of Howard's confession, s*ee* Pet. at ECF p. 15, Doc. No. 1-1, does indeed fail for the same reasons his other *Bruton* based claims fail—the underlying *Bruton* violation was a harmless error and

because there was no prejudice, trial counsel was not ineffective in failing to object or move for a mistrial. Jacobs' arguments pertaining to cumulative error also fail, as the court does not find that there were multiple harmful errors from the three separate arguments Jacobs' raises concerning the one *Bruton* violation.

### 5.        Jacobs' Fifth Objection

Jacobs' fifth objection pertains to Judge Heffley's legal conclusion that "Jacobs' trial counsel was not ineffective in failing [to] move to suppress Willis' testimony." Objs. at ECF p. 19. Jacobs' maintains that "[s]ince the pre-trial identification procedure was unnecessarily suggestive, the resulting identification was unreliable and susceptible to suppression; the Magistrate Judge, therefore, erred in not finding trial counsel ineffective in failing to move to suppress the resulting identification." *Id.*

The court agrees with Judge Heffley's sound analysis on this issue. *See* R. & R. at 22–31. While Jacobs argues that "the Magistrate Judge erred in examining the PCRA Court's decision regarding the suppression of Willis' identification testimony since the PCRA court was not the last state court to rule on the merits of that issue," Objs. at ECF p. 19, the court finds that Judge Heffley did not err. Although Jacobs is correct that the Superior Court was the last state court to review the merits of the issue, the Superior Court reached the same conclusion as the PCRA court while largely relying on the PCRA court's reasoning. To the extent that the Superior Court opinion referenced additional facts, such as the tear drop tattoos that Jacobs and Howard got after the crimes occurred, the court finds that Judge Heffley properly cited to the Superior Court's opinion and reasoning in her report.

Jacobs then notes that he specifically objects to several of the conclusions reached in the report and recommendation concerning Mr. Willis' identification, but Jacobs does not indicate

why he objects to the conclusions beyond restating his initial arguments that Judge Heffley addressed.[15] Objs. at ECF p. 19–20. As such, this objection would not be entitled to *de novo* review. *See, e.g.*, *Watson v. DelBalso*, Civ. A. No. 17-3191, 2020 WL 4015249, at * (E.D. Pa. July 16, 2020) ("Although Petitioner takes objection to the magistrate's ruling on these issues, he fails to explain *why* he believes Judge Heffley is wrong or *how* Judge Heffley misapplied the law. As such, Petitioner's Objections are not entitled to *de novo* review." (citing *Gray v. Delbiaso*, Civ. A. No. 14-4902, 2017 WL 2834361, at *4 (E.D. Pa. June 30, 2017) and *Cherry v. Wynder*, Civ. A. No. 05-2560, 2007 WL 983826, at *7, 8–9 (E.D. Pa. Mar. 26, 2007)).

Nevertheless, the court agrees with the conclusions that Judge Heffley and the state courts previously reached, as there is no evidence of ineffective assistance of counsel when a motion to suppress the identification testimony would have been meritless. *See* R. & R. at 22; Super. Ct. PCRA Op. at 14–20. The well-reasoned report correctly notes that the discrepancies between Mr. Willis' description of Jacobs and Jacobs' appearance seven months later are not sufficient to establish "a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). Furthermore, the Pennsylvania courts' conclusion that Mr. Willis' less-

---

[15] For example, Jacobs states:

> Further, the magistrate judge erred and Jacobs makes the following specific objections to the judges [sic] legal and factual findings in this regard: 1) that the "trial court's conclusion that Willis had ample opportunity to view Jacobs during the crime is not unreasonable, R&R at 24; 2) that the PCRA court's finding that "Willis had affirmatively identified Jacobs in the photo array" was "neither contrary to law or an unreasonable application of the law to the facts," R&R at 27; 3) "Jacobs' contention that the identifications [sic] procedures were suggestive is based on actions taken by the media and not by state officials," R&R at 28 n.9; 4) that Willis' identification of Jacobs was supported by "the fact that Jacobs was found in possession of the murder weapon and by Jacobs' prints on the murder weapon, R&R at 31; and 5) that the "Pennsylvania court's determination that a motion to suppress would have been unsuccessful because Willis had an independent basis to make his identification sufficiently reliable to be admissible was entirely reasonable and provides no basis for habeas relief," R&R at 31.

Objs. at ECF pp. 19–20. Despite these identified issues with the report and recommendation, Jacobs does not identify how or why Judge Heffley erred in these findings and conclusions.

than-certain identification of Jacobs in the photo array did not render his subsequent, "definitive" in-person identifications at the in-person lineup and at trial too unreliable to be admissible, is not an unreasonable application of precedent to the evidence, and Jacobs does not point out a case (or a plausible argument) to the contrary. Additionally, Jacobs' counsel did challenge the identification testimony at trial, and should not be found ineffective simply because the jury did not credit the challenges raised. R. & R. at 29.

While Jacobs argues that, as a result of the media coverage, Mr. Willis' identification of him in the lineup was suggestive and unnecessary and was a result of "the c[o]rrupting effect of the detectives['] use of an unnecessarily suggestive identification procedure," Pet'r's Mem. of L. in Supp. of his Previously File Pet. for Habeas Corpus and Addressing the Anti-Terrorism and Effective Death Penalty Act at 26, Doc. No. 27, the media coverage was not something within law enforcement's control, and therefore no improper law enforcement activity was involved. *See United States v. Zeiler*, 470 F.2d 717, 720 (3d Cir. 1972) ("To sustain appellant's contention that eyewitness identification testimony is inadmissible because of the pretrial publicity would impose on law enforcement officials an affirmative duty to prevent the press from publishing photographs of arrested suspects. Such a holding would raise serious first amendment problems, and we decline to make it."). Additionally, even where state officials employ an unnecessarily suggestive pretrial identification procedure, an in-court identification is still admissible "if the prosecution establishes by clear and convincing evidence that the later identifications were based upon independent observations of the defendant at the scene of the crime and not upon the earlier procedures." *Carter v. Parker*, Civ. A. No. 13-4260, 2014 WL 3964924, at *24 (E.D. Pa. Aug. 12, 2014). As Judge Heffley correctly notes, Mr. Willis had an independent basis to make his identification sufficiently

reliable to be admissible, and therefore counsel cannot be found to be ineffective for failing to raise a meritless motion. R. & R. at 31. Therefore, Jacobs' fifth objection is overruled.

### 6.    Jacobs' Sixth Objection

Jacobs next objects to Judge Heffley's conclusion that his "[trial] counsel was not ineffective in failing to request an instruction based on *Commonwealth v. Kloiber*." Objs. at ECF p. 21. As part of his argument, Jacobs maintains that "[t]he Magistrate Judge speculates that the state court's rejection of Jacobs' suppression of identification claim indicates that the state court would have necessarily rejected Jacobs['] *Kloiber* instruction claim. R& R at 32. This speculation is unreasonable and <u>cannot</u> be supported by any authority." *Id.* at 21–22.

Contrary to Jacobs' argument, Judge Heffley does not base her finding that trial counsel was not ineffective on the pure speculation that the state court would have likely rejected the claim. Judge Heffley does not base her analysis solely on the fact that Jacobs' *Kloiber* claim is procedurally defaulted, although the court finds she correctly concludes that it is. Rather, she appropriately explains,

> Jacobs' ineffective assistance claim regarding a *Kloiber* instruction is based entirely on his contention, discussed *supra* in Section III(B), that the comment Willis allegedly made immediately after the crime that he could not see his attackers' faces and his supposed "failure" to identify Jacobs in the photo array made evidence regarding his subsequent, in-person identifications of Jacobs too unreliable to be admissible. *See* Pet'r's Br. at 32-33. As also discussed in that Section, those arguments lack substance, and his *Kloiber* claim—Claim Six—thus, also is meritless. *See Commonwealth v. Gibson*, 688 A.2d 1152, 1163 (1997) (where the witness did not identify the defendant in a photographic array, but had ample opportunity to view him at the time of the crime and identified him in-person at trial, a *Kloiber* instruction was not required); *Commonwealth v. Yarris*, 549 A.2d 513, 518 (Pa. 1988) (Where one witness stated at the preliminary hearing that she was not positive in her identification and a second witness stated upon picking the defendant from a photo array, that he "had somewhat of a doubt" because the defendant's appearance had changed since the time of the crime, neither was subject to a *Kloiber* instruction "for there had been no prior failures to identify."); *Commonwealth v. Nicholl*, No. 1146 MDA 2019, 2020 WL 754414, at *2 (Pa. Super. Ct. Feb. 14, 2020) (the fact that the witness was "not positive" about her

> identification during a photo array because the defendant had shaved off his beard
> after the crime did not require a *Kloiber* instruction as to her identification in-person
> at trial). Thus, Jacobs' counsel was not ineffective in failing to raise a meritless
> claim. *Ross*, 672 F.3d at 211 n.9

R. & R. at 32–33 (internal footnote omitted). Accordingly, based on Judge Heffley's well-reasoned analysis, the court finds Jacobs' objection reiterating his claim that his counsel was ineffective for failing to ask for a *Kloiber* instruction is procedurally defaulted and otherwise without merit.

### 7.     Jacobs' Seventh Objection

Jacobs' seventh objection is to Judge Heffley's conclusion that "because Jacobs has identified only a single error by the state court…his cumulative error claim is meritless." Objs. at ECF p. 23. Jacobs objects on the ground that he presented five individual errors by the state court, and therefore it was plain error for the magistrate judge to find Jacobs' cumulative error claim meritless. *Id.* However, the court does not find that Judge Heffley erred because she sufficiently addressed each of Jacobs' individual claims, and only found state court error in one instance pertaining to a *Bruton* violation, which this court ultimately holds to be harmless. Jacobs maintains that "to properly ascertain the merits of Jacobs' cumulative error claims, it was incumbent upon the Magistrate to separately address each of Jacobs' ineffectiveness claims. . ." *Id.* at ECF p. 24. The court finds that this is exactly what Judge Heffley did in her report and recommendation, and therefore the court finds that it was proper for her to conclude that there was no cumulative error based on her review of the individual claims.

### 8.     Jacobs' Eighth Objection

Lastly, Jacobs "specifically objects to the Magistrate Judges [sic] recommendation that Jacobs' 'petition for writ of habeas corpus be denied and dismissed' and her legal conclusion that 'there was no substantial showing of the denial of a constitutional right requiring the issuance of a certificate of appealability.'" *Id.* at ECF p. 26. He claims each individual claim that he presented

to the court demonstrated a substantial showing of the denial of a constitutional right, particularly so with regard to his *Bruton* error claims where Judge Heffley herself acknowledged the prosecutor's violation of Jacobs' Confrontation Clause rights. *Id.* However, because this court has concluded that the *Bruton* error is harmless, and that Jacobs' other claims lack merit, the court overrules Jacobs' objection. Although this court is denying a certificate of appealability,[16] Jacobs is advised that he has the right for thirty (30) days to appeal the order denying his § 2254 petition, *see* 28 U.S.C. § 2253(a); Fed. R. App. P. 4(a)(1)(A), and that this court's denial of a certificate of appealability does not prevent him from appealing, so long as he also seeks a certificate of appealability from the Third Circuit Court of Appeals. *See* Fed. R. App. P. 22; 3d Cir. Local R. App. P. 22.1.

## III.   CONCLUSION

The court agrees with Judge Heffley that the court should deny Jacobs' petition for a writ of habeas corpus. Therefore, the court overrules the petitioner's objections for the most part. However, while the court adopts the part of the report recommending denial, the court also modifies the report insofar as the court has conducted a *de novo* harmless error analysis with respect to Jacobs' *Bruton* issue. Accordingly, the court overrules the objections to the report and recommendation, except to the extent that Jacobs' first, second, third, and fourth objections pertain

---

[16] The court should only issue a certificate of appealability if Jacobs "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. 2253(c). "Where a district court has rejected the constitutional claims on the merits . . . the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In addition,

> [w]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Id.* Here, for the reasons discussed in this opinion and in the report, the court finds that reasonable jurists would agree that Jacobs' habeas claims lack merit, or as with his claim regarding his counsel's purported ineffectiveness for failing to ask for a *Kloiber* instruction, procedurally defaulted (and also meritless).

to Judge Heffley's analysis on the harmlessness of the *Bruton* violation. The court supplements Judge Heffley's analysis with its own with respect to these objections and as otherwise indicated in this memorandum opinion. The court also declines to issue a certificate of appealability.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.